ROBERT S. HUDSPETH, trustee, et al.,

*v.*

HENRY M. DENTON et al.

[Decided May 17th, 1912.]

In the month of April, 1900, defendant H. was owner of one hundred shares of stock of complainant banking company, and defendant D. was owner of property covered by the mortgage hereinafter mentioned, and by an agreement between the parties then made, H. in form sold to D. said shares, and received from D. two promissory notes for $12,000 each with the understanding that, as collateral security for the payment of the indebtedness evidenced by said notes, D. would, amongst other things, mortgage said property to H., and subsequently, and in the month of July, 1900, by an agreement between D. and H. a note for $24,000 made by defendant S. to H. was given to him in place of said two $12,000 notes, and subsequently, and in pursuance of the original agreement between D. and H., D. and wife made to H. a mortgage dated September 1st, 1900, securing the payment of a bond of like date for $12,000 payable on demand, the obligee and mortgagee being ,H. The note of S. was used by H. at the complainant bank for H.'s benefit and during the time this original indebtedness existed, and so long as it was continued, by successive renewals of notes subsequently given the bank, was entitled to recover on said mortgage as collateral security the whole, or such part thereof, as still remained unpaid to it, of the original indebtedness. Subsequently, and beginning in the month of August, 1901, D. availed himself of said stock and used the same as collateral security for moneys advanced to him by various banking institutions, and H. subsequently paid off said notes thus made by D. to the banking institutions where said stock was collateral, and regained possession of said collateral, and H. subsequently, and in the year 1905 by arrangement between himself and complainant bank secured the return to himself of the S. notes to which said mortgage was collateral, and thereafter repledged the same to the said bank for whom the complainant is trustee in this behalf, and said bank is entitled to recover in the person of the trustee, upon said mortgage whatever sum of money, if any, there may be found due from D. to H., or now due to said bank on account of moneys received by D. upon promissory notes made by him and discounted by banking institutions with said stock as collateral and which note or notes have not been paid off by H. with his own funds with the purpose of regaining possession of the stock, and for which sums so found to be due H., the said H. has not been repaid by D. The transaction between H. and D. in April, 1900, was not a sale of the stock then owned

by H. to D., but was a mutual exchange of securities for the purpose of enabling each to borrow upon the securities of the other, thus transferring from one to the other, and results in finding indebtedness from one to the other to such an extent only as either of the parties availed himself of the securities of the other, to borrow money upon, without repaying the same or restoring the securities unencumbered. The question whether anything is due upon this mortgage and collectible by the complainant depends upon whether or not an accounting shall disclose any sum realized by D. by the use of H.'s stock, which sum was not repaid by D. to H., and which sum H. had to pay to the person from whom D. borrowed, so as to regain his (H.'s) stock. In a suit by H. as trustee, and the said bank for which he is alleged to be trustee, against D. and wife, S. and H., to foreclose said mortgage, the complainant is entitled to have the benefit of the mortgage in suit to the extent, if any, that it may be found, upon an accounting, that D. owed to H. money realized by him upon the stock of the complainant bank owned by the said H., and transferred and loaned by him to the said D., and that for the purpose of ascertaining the facts with respect thereto this matter should be referred to one of the masters of this court to take the said account and report the same.

On final hearing on pleadings and proofs.

*Mr. Merritt Lane,* for the complainants.

*Messrs. Vredenburgh, Wall & Carey,* for the defendants.

GARRISON, V. C.

This is an action by Robert S. Hudspeth, trustee, and the Second National Bank of Jersey City, for which he is alleged to be trustee, against Henry M. Denton and his wife, Robert L. Shaw and William Hogencamp. It is a suit to foreclose a mortgage upon lands at Lakewood, New Jersey. The bond and mortgage in suit were executed by Denton (and wife) on the 1st day of September, 1900, the bond being payable on demand and being for $12,000, the obligee and mortgagee being William Hogencamp.

Since it is conceded that this is not the ordinary case of an advance of money by the mortgagee to the mortgagor, it became necessary for the complainants to allege and prove facts which entitled them to enforce the payment of the bond and mortgage in suit.

Very briefly stated, they allege that the bond and mortgage in suit were pledged with the Second National Bank to secure the payment to it of an indebtedness of Robert L. Shaw, and that such indebtedness has never been paid, and that, therefore, they, the complainants, are entitled to enforce this collateral security to that debt.

Unfortunately, the circumstances are such that the court cannot make a concise finding of fact, but must, at some length, state the reasons which lead to the conclusions reached.

Henry M. Denton, one of the defendants, prior to the year 1900 and thereafter, was engaged in building operations in the city of New York. These operations were upon a much larger scale than the amount of capital possessed by him warranted. He interested William Hogencamp, who was, and for many years prior to the year 1900, had been president of the Second National Bank of Jersey City. All the proofs in the case concerning the bank's method of doing business lead to the conclusion that Hogencamp practically did as he pleased in managing the bank. From the year 1900, down through all of the period that is material in this case, the dealings and relationships between Hogencamp, Denton and the bank are so numerous, intricate and confused that it is impossible for the parties themselves (and, of course, more so for the court or any third person) to define and explain them.

Beginning with the year 1900, Denton began receiving large sums of money through Hogencamp. Denton knew the bank in those transactions only inferentially, or secondarily. He dealt solely with Hogencamp; and while it is undoubtedly the fact that in most instances Denton's notes were discounted by or loaned upon by the bank, in others money was furnished by Hogencamp's borrowing from the bank and advancing the money to Denton.

Just what interest Hogencamp had at the commencement of the relationships between him and Denton in those large real estate operations of Denton it is impossible to determine. After awhile all proceeds thereof went to Hogencamp, Denton retaining therefrom only $25 a week for his personal living expenses.

. On the 2d of April, 1900, Denton, by a payment of something

over fifty-seven thousand dollars, discharged all of his indebtedness to the Second National Bank then due. Mr. Hogencamp at this time had in his physical possession the deed by which Denton had acquired title to the Lakewood property (subsequently mortgaged), and also a mortgage made by one Hanford to Denton for $12,000, secured upon the "Rink Stable Property" in Jersey City. This last-named mortgage was upon an undivided one-half interest in said property which Hanford had owned.

It hardly seems possible that these papers could have been in Hogencamp's possession for any other purpose than safe-keeping, although the parties may have thought that some equitable rights could be created in Hogencamp by his having physical possession of these papers. I should not refer to the matter were it not that in the testimony these papers were often adverted to.

On the 23d day of April, 1900, Denton gave to William Hogencamp two promissory notes, each for $12,000, at three months each, drawn by Denton either to his own order or to Hogencamp's order. The testimony of the only two witnesses who are shown to have any knowledge concerning this transaction is absolutely contradictory each of the other. Hogencamp testifies that Denton was desirous of becoming a stockholder in the Second National Bank; that Hogencamp had large amounts of the stock of that bank; that upon the date in question he sold one hundred shares of his stock at a valuation of $240 per share to Denton for the gross sum of $24,000, and that Denton thereupon and therefor gave to him, Hogencamp, in payment for the stock his two promissory notes of $12,000 each.

Hogencamp further testifies that upon that date he physically handed over to Denton the one hundred shares of stock in question, and that Denton physically handed the same back to Hogencamp, to be held by him as collateral for the payment of the notes just mentioned. He further testifies that Denton then agreed to assign to him, Hogencamp, the Hanford mortgage upon the Rink Stable property in Jersey City, and also to make a mortgage upon the Lakewood property to Hogencamp, which

two securities could then be held by Hogencamp as further col-
lateral for the payment of the notes just mentioned.

Denton testifies that upon the date in question Hogencamp
told him that he, Hogencamp, was unable to use the stock which
he owned in the Second National Bank as collateral for loans
obtained from that bank, and that if Denton would allow Ho-
gencamp to apparently sell to him one hundred shares of the
stock of the Second National Bank for the apparent considera-
tion of $24,000, and should give his notes to Hogencamp for
that sum, and would give to Hogencamp as security for the pay-
ment of the notes the Hanford mortgage upon his Lakewood
property, Hogencamp would be able thereby to obtain money
upon all of these securities—that is, through Denton's using the
stock as collateral to Denton's notes elsewhere, money could be
obtained therefrom, while Hogencamp could use Denton's notes
with the mortgages as security in the Second National Bank,
and in this way money could be obtained on loans on all of these
securities as collateral.

Denton absolutely denies that any stock of the bank was then
shown him, let alone passed to him and passed back by him to
Hogencamp.

Since it will be necessary, in the more or less chronological
statement which I purpose making, to refer, in their proper
order, to other facts bearing upon this matter, I shall not dilate
thereon at this point.

On the same day on which Hogencamp procured from Denton
the two $12,000 promissory notes above referred to, Denton,
through Hogencamp, secured $16,000 from the Second National
Bank upon a note. On the 23d day of July, 1900 (which it
will be observed is just three months after the date of the Den-
ton notes), Robert L. Shaw, who is the brother-in-law of Den-
ton, and who previously had been engaged in the livery stable
business with Denton, and who was a depositor in the Second
National Bank, gave to William Hogencamp his note, payable
on demand, for the sum of $24,000. It is conceded by every-
one in the case that Shaw obtained no money whatever upon this
note, and no benefit whatever from having given it, and that it

was solely, to the knowledge of both Hogencamp and Denton, an accommodation by Shaw.

Hogencamp says that at the time in question Denton's affairs with the Second National Bank were in such condition that he could not use Denton's two $12,000 notes to borrow money on from that bank, and that therefore he requested Denton to obtain, in substitution of his two $12,000 notes, a note from Shaw for $24,000 upon which Hogencamp would be able to borrow. This is not seriously disputed by Denton. Shaw does not appear at all, and Denton does not have any clear recollection of what happened at the time the Shaw note of $24,000 was given to Hogencamp, but, as before stated, it is unquestioned that Hogencamp got it from Shaw without consideration and solely because of the relations between Denton and Hogencamp, and to be used for their benefit or the benefit of one of them.

On the 23d day of July, 1900, Hogencamp procured the Second National Bank to loan on the Shaw $24,000 note the sum of $24,000. He says that upon that date he, Hogencamp, was responsible to the bank upon notes of one Littell for the sum of $25,056.25, and that with the money procured upon the Shaw note, and $1,056.25 of other money which he furnished, he paid off to the bank the Littell notes.

Hogencamp further says that at the time of procuring the loan from the bank upon the Shaw note he gave to the bank as collateral thereto the one hundred shares of stock of the Second National Bank which he says he had sold to Denton on the 23d of April, 1900, and which he says Denton left with him as collateral for the payment of the purchase price to him. This alleged transfer of collateral was entirely a mental operation, there not being any physical thing done with respect thereto, the stock remaining as before in the possession of Hogencamp.

He also says that the mortgage on Denton's Lakewood property and the Hanford mortgage, which was owned by Denton, were also to be held by him as collateral to the Shaw note. It will be recalled that the mortgage on the Lakewood property was not yet in existence, and that the Hanford mortgage, which ran to Denton, had not yet been assigned to Hogencamp.

On the 1st of September, 1900, Denton made to Hogencamp the mortgage on the Lakewood property for $12,000. (This is the mortgage in suit.) And also he made a written assignment upon that date to Hogencamp of the Hanford mortgage.

On the 12th day of August, 1901, Hogencamp transferred on the books of the Second National Bank three certificates of stock to Henry M. Denton, 347-A for forty shares; 348-A for fifty shares, and 349-A for ten shares.

Just before this time Denton was being very severely pressed by a New York lawyer named McKelvey, who represented the New York and Batavia Wood Working Company, a judgment creditor in New York of Denton's. Application was made to Hogencamp to advance to Denton the two thousand odd dollars which McKelvey then demanded as consideration for refraining from pressing Denton upon the balance of the judgment at that time. Hogencamp was not in a position to respond with cash at that time but offered to loan Denton fifty shares of stock in the Second National Bank which Denton could use to raise money upon to satisfy McKelvey.

On the 15th day of August, 1901, Hogencamp gave to Denton and his New York lawyer O'Callaghan certificate No. 348-A for fifty shares. It will be observed that this is one of the certificates which were issued to Denton under the transfer from Hogencamp on the 12th of August, 1901. Denton took the certificate for fifty shares and his note for $6,000 to McKelvey, who had the same discounted at the Chase National Bank, and retained the amount then agreed to be paid to him, namely, two thousand and odd dollars, gave to Denton the balance, some three thousand and odd dollars, which was brought back by Denton to Hogencamp, and was by Hogencamp deposited in an account in the Second National Bank which he carried under the title of William Hogencamp, trustee.

At the same time Hogencamp demanded and received from Denton a mortgage for $7,500 upon a property which Denton owned in New York, which mortgage the testimony shows was by Hogencamp subsequently assigned to some third person, and presumably he received a consideration equivalent to the amount of the mortgage. This mortgage the testimony shows was given

to him to secure him for having loaned to Denton the fifty shares of stock of the Second National Bank.

On the 20th day of August, 1901, Hogencamp wrote a letter upon the letter-head of the Second National Bank, addressed to himself as president, requesting him to deliver to Henry M. Denton the one hundred shares of stock of the Second National Bank, and cause the same to be signed by Robert L. Shaw. On the 22d day of August, 1901, Hogencamp caused Denton's mortgage on the Lakewood property (the mortgage in suit) and the assignment of the Hanford mortgage to him to be recorded.

On the 23d day of August, 1901, Hogencamp gave to Denton the two certificates heretofore adverted to, one for forty and one for ten shares, of stock of the Second National Bank, which Denton then took to the Commercial Trust Company in Jersey City and pledged as collateral to Denton's note for $6,000, which $6,000 Denton brought back to Hogencamp who deposited it in the account heretofore referred to entitled, "William Hogencamp, trustee."

On the 16th day of November, 1901, Hogencamp wrote two letters, one of which he signed himself and the other of which he caused Mr. Hasking, the cashier of the Second National Bank, to sign. Just before this time Denton's note in the Chase National Bank of New York, which he had given to McKelvey, and with which the fifty shares of stock which Hogencamp gave to Denton on the 15th day of August, 1901, were pledged as collateral, became due and was unpaid, and McKelvey had taken the note and collateral out of the bank. McKelvey was threatening to hold the stock to satisfy not only the $6,000 represented by the note with which it had been pledged as collateral, but also for a balance due upon the judgment against Denton which his client, the wood working company, held.

At the date before mentioned, November 16th, 1901, Hogencamp wrote the letters before mentioned, one of which was to Honeck, an officer of the wood working company, and in that letter Hogencamp informed him that he had transferred fifty shares to Denton on August 12th, 1901, by certificate A-348, and that before that time Denton was not a stockholder in the bank. In the other letter, which was addressed to McKelvey,

the attorney for the wood working company, Hogencamp tells him that he had loaned, on August 12th, 1901, fifty shares to Denton to borrow on, and that now Hogencamp has to redeem it. He also says in that letter that Denton never owned the stock, that it was "my" (Hogencamp's) "property."

The subsequent happenings, with respect to this matter, were these: On May 1st, 1902, Denton drew his check on the Second National Bank to John J. McKelvey for $7,255, which was the amount necessary to satisfy McKelvey for the note, interest, &c., and to release the fifty shares of stock which he held; and on the same date Denton drew his check to the Commercial Trust Company for $6,067, which was the amount necessary to satisfy that institution for the note of Denton's that it held, for which he also held fifty shares of stock as collateral, and Denton thereupon received from each of these parties the respective fifty shares which, on the next day, May 2d, 1902, he took to the Hudson Trust Company in Hoboken and pledged to it for a loan of $13,500 which he thereupon procured upon his note, and this money was brought back and deposited in his account to make good the two checks just above mentioned, one to the Commercial Trust Company and one to McKelvey.

On the 24th day of July, 1902, Hogencamp procured the Second National Bank to loan $25,000 upon two notes of Robert L. Shaw, made to the order of himself and by him endorsed, one for $12,000, dated June 30th, 1902, and one for $13,000, dated July 23d, or 24th, 1902. One thousand dollars of this was a personal matter of Shaw's and is not in any way involved in this suit. Shaw at this time gave a mortgage to Hogencamp upon the Ring Stable property before mentioned. He and Hanford had owned this property, and Hanford had mortgaged his undivided one-half to Denton, who had assigned the mortgage on September 1st, 1901, to Hogencamp. Shaw subsequently purchased the whole property, and this last-named mortgage of his for $13,000 to Hogencamp was upon the whole property.

This mortgage was the subject-matter of the suit of *Leonard Richards* v. *Robert L. Shaw*, which is so often referred to in the trial of the suit at bar.

By checks which Hogencamp caused Shaw to sign $24,000 of the money advanced by the bank on the $12,000 and $13,000 Shaw notes aforesaid, was paid back to the bank to take up the $24,000 note of Shaw theretofore loaned on by the bank, dated July 23d, 1900. No explanation is made by anyone as to why these two Shaw notes bore different dates, the $12,000 one being dated June 30th, 1902, and the $13,000 one being dated July 23d, or 24th, 1902.

In the latter part of the year 1904 the bank examiners of the United States government were busied with the affairs of the Second National Bank. They objected to a large number of loans which appeared in the demand loan account, and which, for one reason or another, Hogencamp, the president of the bank, was charged with the responsibility for. Upon the demand of the bank examiners many of these items were taken out of the demand loan account and were carried to an account called "Suspended Debt," for which account Hogencamp was by the bank, in one way or another, held responsible. I cannot determine from the testimony whether the claim was that he was legally liable for all of these various items, or whether, by reason of his conduct as president of the bank, he was charged with responsibility concerning them, and in that way was looked to as responsible. However, this is really immaterial, because he seems to have assumed the responsibility concerning them.

On the 7th day of September, 1905, Hogencamp sold for something over $125,000 all of the stock which he held in the Second National Bank, and incidentally he sold the one hundred shares which he says belonged to Denton. On that date, September 7th, 1905, he paid to the credit of this suspended debt account a large sum of money, something over $38,000. He testifies that this was for other items than the Shaw indebtedness, and that after this payment he still was responsible to the suspended debt account for $35,000, which he says was made up of the two Shaw notes, aggregating $25,000 and $10,000, remaining due upon an indebtedness in that account of Pratt & Wellman.

With respect to the sale on the 7th of September, 1905, of the stock which Hogencamp testifies that he had sold to Denton, Hogencamp says that he sold this stock for $19,000: That from

this sum (the $19,000) he deducted $10,000 which he had contributed to pay Denton's note at the Hudson Trust Company at the time that Denton's $13,000 note there was taken up, and some other items due him by Denton, leaving a balance due Denton of $7,652.80, which he credited upon a demand note dated July 19th, 1901, made by Denton to Hogencamp for $13,-000, with interest. Hogencamp admits that he did not communicate with Denton concerning the sale or the disposition of the proceeds, and that Denton had no knowledge concerning them. Hogencamp claims the right to thus deal with the stock because he asserts that when the loan was paid off at the Hudson Trust Company, and the one hundred shares was received, by Denton, he, Hogencamp, had contributed the $10,000 just referred to to be used as part of that payment, and was handed the stock by Denton, to be held by him as security for the repayment thereof.

The bank continued to press Hogencamp to take up and pay off the balance for which he was responsible of the suspended debt account, which, as before stated, amounted to $35,000, and which Hogencamp says was made up of the two Shaw notes, aggregating $25,000, and an item of Pratt & Wellman amounting to $10,000.

For the purpose of complying with the bank's demand in this respect Hogencamp arranged with Dwight S. Harding, a citizen of New York, to obtain the $35,000. His understanding with Mr. Harding was as follows: Hogencamp was to give his note for $35,000 to Mr. Harding and was to give to Harding as security that the note would be paid the following things: A mortgage upon Hogencamp's property at Deal, New Jersey, for $35,-000; a mortgage upon Hogencamp's residence at Paterson, New Jersey, for $10,000; and after the $35,000 had been paid to the bank and they had given up the two Shaw notes and the Shaw mortgage for $13,000 and the Denton Lakewood mortgage (the one in suit) for $12,000, all of those were to be pledged with Mr. Harding for the same purpose.

For some undisclosed reason the transaction with Harding fell through; but the undisputed testimony is (and the only testimony on the point) that the bank (Hogencamp being no longer

connected in any way with the bank) offered to take Harding's place and do exactly what would have been done had Harding carried out the transaction, and that this was done.

As a result, what then happened was that Hogencamp gave his note to the bank for $35,000, and they gave credit to the suspended debt account for $35,000. This was done on the 24th day of March, 1906. Since Hogencamp had already made the mortgages to Harding, they were, by appropriate instruments, assigned by Harding to the bank or its trustee, Hudspeth.

After this transaction, therefore, the situation was that the bank held the obligation of Hogencamp for $35,000, and as security therefor they held a mortgage from Hogencamp to Harding, assigned to Hudspeth, trustee, for $35,000 on Hogencamp's Deal property, and a mortgage similarly made and assigned for $10,000 upon Hogencamp's Paterson property, and they also held the Shaw notes and the Shaw mortgage for $13,000 and the Denton $12,000 mortgage on the Lakewood property, the one in suit. The last-named securities were, of course, what can be termed a "repledge"—that is to say, they were not put up by Hogencamp with the bank at the time that he got the $35,000 credit, which went to the suspended debt account, but were put up by him with the bank after that period. In other words, the transaction was this: Hogencamp, being responsible to the bank, or being held by the bank to be responsible to it, for the $35,000 owed to the suspended debt account, the items of which were the two Shaw notes of $12,000 and $13,000, aggregating $25,000, and the $10,000 balance of the Pratt & Wellman note, the bank obtains from Hogencamp his note for $35,000 and credits the suspended debt account with that sum on account of "Bills Discounted," the "Bills Discounted," unquestionably, being the note for $35,000 just mentioned. The bank received at that time, as security for the payment of the $35,000, Hogencamp's note, the $35,000 Deal mortgage and the $10,000 Paterson mortgage. The $35,000 was credited to the suspended debt account for the purpose of taking up and out of that account the remaining items therein for which Hogencamp was held responsible, namely, the Shaw notes aggregating $25,000 and the Pratt & Wellman $10,000.

Afterwards Hogencamp repledged these notes, and the collateral which had been held for their payment, namely, the Shaw mortgage and the Denton mortgage on the Lakewood property, to the bank as additional security.

It would be absolutely impossible, within the limits of any permissible expression of the court's finding, to do more than advert generally to the great mass of testimony concerning the personal dealings between Denton, Hogencamp and the bank from the year 1900, when we are first concerned with them, down to 1906, when they practically ceased. For a period of ten days witnesses have been giving evidence concerning these matters and the items are on hundreds of pages of books, checks, contracts and other instruments of proof.

Generally speaking, the following is a *résumé* of the proofs: Beginning as early as 1900, some of the rents from Denton's New York property reached Hogencamp, and after a period beginning in 1901 all of the proceeds of Denton's New York property reached Hogencamp; and in addition to such proceeds, which consisted not only of rents, but the products of sales of the property, Hogencamp had made to him numerous mortgages upon these properties, and in many instances received the moneys upon such mortgages. Down to December, 1912, Denton had a personal account in the Second National Bank. William Hogencamp, throughout the entire time involved, had a personal account; and, in addition thereto, had three accounts. "William Hogencamp, Trustee," began on the 14th day of November, 1901, and the last item is in August of 1902. Through this account there passed something in excess of $68,000. "William Hogencamp, Attorney," began on the 20th of January, 1903, and the last item is January 4th, 1904. Through this account there passed more than $26,000. "William Hogencamp, Rent," began November 20th, 1903, and the last item is January 5th, 1906. Through this account there passed more than $126,000.

William Hogencamp, with the designation to determine out of which account it should be taken, constantly drew checks against each of these three last-named accounts; and in many instances, at a time when Denton had no personal account what-

ever in the bank, he, Denton, drew checks upon the Second
National Bank which Hogencamp caused to be cashed out of one
or the other of these three accounts.

It is practically undisputed that, beginning about 1901, all
Denton's real estate speculations in New York were carried on
jointly by Hogencamp and Denton; whether there was to be any
joint participation in profits and losses does not appear and does
not have to be decided.

It does appear that Hogencamp personally participated in
directing what should be done concerning these properties; to
whom and for what price they should be sold, and that the pur-
chase price coming to Denton after payment of encumbrances in
each instance, passed to Hogencamp; and in addition, there
passed to Hogencamp the money represented in numerous mort-
gages upon the properties which Denton was acquiring and was
selling in the city of New York. In addition to this, loans were
made from the bank to Hogencamp and to Denton, the pro-
ceeds of which were used in these New York operations; and
beginning some time, I think, in 1903, Denton took out of the
proceeds of his New York speculations only $25 a week for
living expenses, and all the balance went to Hogencamp, and
Hogencamp seemed to have assumed the personal direction, if
not responsibility, of finishing the uncompleted buildings then
in process of erection upon Denton's property, and of selling
the properties when completely constructed.

Hogencamp contends, with respect to all of these transactions
and to the entire course of dealings between him and Denton,
that he passed through one of these three accounts, or through
his own and Denton's account, all moneys which came to his
hands in such a way that Denton got the benefit of them. He
did not attempt to demonstrate this, and it only could be demon-
strated after an accounting which would require a vast amount
of time to take.

Denton is practically ignorant of the result of his dealings
with Hogencamp and the bank, and is not shown to have any
records, books or the like which would enable him to determine
how he stood. Hogencamp kept no books of any use, and it is

only by the most laborious tracing of items through the bank's books that any result can be reached concerning them.

If, in any aspect of the case, the right of the complainants to foreclose this mortgage depends upon a finding that Denton is indebted to Hogencamp, there will have to be a reference to a master to take proofs as to the accounting and to report a conclusion as to the result of such proofs.

To avoid any such necessity as that last suggested, the complainants put forward the first of their two theories:

That theory may be fairly set forth as follows: Denton, on the 23d of April, 1900, gave to Hogencamp his notes for $24,-000. We may leave aside, in discussing this present theory, whether the transaction with respect to the stock upon that occasion was a *bona fide* sale, or was merely an illusory proceeding, because, on the 23d of July, 1900, it is admitted that Shaw gave his note to Hogencamp for $24,000, as an accommodation to take the place of the two Denton notes, aggregating $24,000 previously given. The bank having loaned $24,000 on the Shaw note, dated July 23d, 1900, and the Denton mortgage having been agreed to be given as collateral for this indebtedness (although not actually executed until September 1st, 1900), was, when executed and delivered, held as collateral for this loan by the bank on the Shaw note. The bank still holds the Shaw note and the collateral, to wit, the mortgage in suit; and since the Shaw note has not been paid, the bank has the right to foreclose the Denton mortgage which was held as collateral to it. I think this is a fair statement of the position taken by the counsel for the complainants with respect to this first theory.

So far as anyone can express himself with assurance in a case that is so involved as this one, I am prepared, in considering this theory, to accede to the conclusion if the premises upon which it is rested are correct in fact. I do not find, however, that the precedent factors exist to justify the conclusion. It must be recalled in the first instance that there is no documentary or other proof of any description, excepting Hogencamp's testimony, that the Denton mortgage of $12,000, dated September 1st, 1900, was to be held by the bank or by anyone. At the time that the mortgage was given by Denton, on the 1st of

September, 1900, Shaw's note of $24,000 was in the bank, having been loaned upon by the bank on the 23d day of July, 1900, the day of its date. At the same time that Denton gave the mortgage upon his Lakewood property he assigned to Hogencamp the $12,000 mortgage which had been made by Hanford to Denton upon the undivided interest of Hanford in the Rink Stable property in Jersey City. There is nothing on the books of the bank nor elsewhere to show that these titles thus vested in Hogencamp (one to the mortgage on Denton's Lakewood property, and one to the mortgage which Denton had of Hanford's) were as collateral to any transactions whatever with the bank, or, in fact, with Hogencamp. The books of the bank with respect to other transactions do show mortgages that were held by the bank and upon which money had been loaned—the money, presumably, of course, was loaned upon notes to which the mortgages were security.

Passing this question, however, and assuming in favor of the complainants that their contention is correct that these securities when created were intended to be, and, after being created, actually were held by the bank as collateral to the Shaw notes, we next come to the transaction of July 24th, 1902, when the Shaw note of $24,000 was taken out of the bank.

There is no testimony of any value, if there is any at all, which shows that at that time there was any agreement between the parties and the bank that the mortgages of Hanford to Denton assigned to Hogencamp, and of Denton directly to Hogencamp (the latter on the Lakewood property) were to be collateral to the two notes which Shaw then gave, one of $12,000 and one of $13,000. It may very well be argued on behalf of Denton that, assuming the previous point which has just been dealt with to be decided against him, and that the mortgage on his Lakewood property was given by him to Hogencamp in order that he might turn it over to the bank as security for the $24,000 Shaw note of July 23d, 1900, it does not at all follow that when that $24,000 note was taken up, as it was, and new notes were secured from Shaw, that the collateral which was obtained for the loan of July 23d, 1900, should still be held for the new loans.

Passing this, in turn, and deciding, for the purpose of the further discussion of the point, that the result of the transaction of July 24th, 1902, when the bank loaned $25,000 upon Shaw's notes of $12,000 and $13,000, respectively, was to vest them still with the Denton mortgage as security for the payment of those loans, there is no evidence that any agreement of the parties split up the collateral with respect to any part of the indebtedness that day arising; that is to say, on that day, July 24th, 1902, two notes of Shaw were loaned upon by the bank. The item appears in the bank's books as one transaction —that is, on that day, in the demand loan account, the only place where the item appears, Shaw is charged with $25,000. This, the proofs show, was upon two notes of Shaw's, one dated June 30th, 1902, and the other dated July 23d, or 24th, 1902; that the first note was for $12,000 and the latter for $13,000. There is not the slightest evidence to show that the parties then, or at any other time, agreed that the Denton mortgage of $12,000 upon the Lakewood property was to be held as collateral for any part of this indebtedness. If the complainants obtain the benefit of all their debatable points so far considered, the utmost that they could claim would be that Denton's $12,000 mortgage was collateral for the entire indebtedness and not for any specific part of it.

This is important in one aspect, at least, of the case, because if the entire indebtedness were reduced, or if their other collateral, the right of the holder of the indebtedness against the owner of the collateral would be affected by those incidents— not to the extent of relieving the collateral holder from paying what might be due upon the entire indebtedness or having his collateral sold for that purpose, but because such circumstances would entitle the owner of the collateral to the use for his own benefit of whatever had been paid and whatever had been received by way of other collateral if and when he was called upon to pay the balance.

Assuming, however, that it is further decided in favor of the complainants that the circumstances just adverted to does not prevent them from asserting their right to foreclose the Denton mortgage in suit if they can establish the validity and non-pay-

ment of the Shaw note of $12,000, we next come to the most important and determinative feature:

Here, it should be recalled and firmly fixed in the memory, that it is admitted by all concerned that Shaw was an accommodation maker, and that his original $24,000 note, and his two subsequent notes, of $12,000 and $13,000, respectively (leaving out of account $1,000 represented by the last two notes, with which we are not at all concerned in this case), were executed by him solely to accommodate Denton and Hogencamp, and that as to each of the last two-named persons no obligation arose by reason of the execution by Shaw of the notes in question; and no liability to those two persons arose as against Shaw by reason of the notes signed by Shaw. It is only when these notes, or any of them, passed into the hands of *bona fide* holders for value that Shaw can be held liable. Of course, if Shaw cannot be held liable upon his notes, or, in the particular case before this court, on his $12,000 note to which the Denton mortgage is asserted to be collateral, then the collateral may not be utilized by the holder. That is to say, the only right which the complainants here can assert as against Denton must rest upon their right to assert a valid claim against Shaw upon his $12,000 note; they cannot foreclose the $12,000 mortgage upon the Denton Lakewood property unless they prove that the note of Shaw of $12,-000, to which this mortgage was collateral, was valid and enforceable against Shaw.

In my view the proofs do not establish this last-mentioned contention. In my view the proofs show that on March 24th, 1906, Hogencamp paid off to the Second National Bank the Shaw notes and became vested with title to such notes and to the collateral which had been held by the bank for their payment. It will be recalled that in the previous portion of this opinion I have briefly referred to the testimony of Hogencamp concerning the transaction with Harding and the bank at the time that he got the loan of $35,000 from the bank on March 24th, 1906, which was credited to the suspended debt account to take out of it the Shaw notes and the remaining $10,000 of the Pratt & Wellman note. Hogencamp's own oral testimony is to the effect

that I have just referred to; and the entries in the books of the bank and the other documentary proofs bear him out.

From all of this the following undisputed facts appear: In December of 1904 various items from "Demand Loans" were ordered to be taken therefrom and charged against an account entitled "Suspended Debt." All of these items were those which the bank then held Hogencamp either personally or indirectly responsible for. Among these items were the Shaw notes, aggregating $25,000. One of such notes, namely, the one dated June 30th, 1902, is the note which the bank loaned upon on the 24th day of July, 1902, and to which the Denton mortgage in suit is said by Hogencamp to have been collateral. Subsequently, and on the 7th of September, 1905, Hogencamp paid off on the suspended debt account something over $38,000. In the trial of *Richards* v. *Shaw* he testified, as is shown in the present suit, that by that payment then made he took up the Shaw notes, and, of course, the collateral that was deposited therewith, among which was the Denton mortgage in suit. In the present suit he denies the truthfulness of that testimony previously given, and asserts that he was mistaken. There is nothing from the books of the bank by which it can be determined what particular items of the suspended debt account were taken up and out of that account by the payment by Hogencamp on September 7th, 1905, of the thirty-eight odd thousand dollars.

Assuming, however, in favor of the complainants, that they may have the benefit of Hogencamp's present testimony, which is in direct contradiction of his testimony in the previous case, we next come to the transactions of March, 1906. According to Hogencamp, at that time he was being held responsible by the bank for $35,000 balance due on the suspended debt account. That $35,000, he says, was made up of the $25,000 of Shaw notes and the $10,000 balance of the Pratt & Wellman notes. At that time he arranged with Dwight S. Harding to obtain a loan from Mr. Harding of $35,000, for which he was to give Mr. Harding his note for that amount. He was to secure the payment of that note by a mortgage upon his Deal property for $35,000, a mortgage on his property for $10,000, and after the Shaw notes were by the payment of the $35,000 taken out of

the suspended debt account and delivered by the bank to Hogencamp, he was to transfer those with their attendant collateral (among which it will be remembered is the Denton mortgage in suit) to Harding.

When Harding refused to advance the money the bank undertook to take Harding's place and to do just what Harding had agreed to do. This is Hogencamp's own testimony concerning this transaction, and is uncontradicted and is borne out by what next happened. What next happened was the giving by Hogencamp to the bank of his note for $35,000; the crediting of this note under the head of "Bills Discounted" to the suspended debt account; the transfer to the bank by Hogencamp, through Harding, of the $35,000 mortgage on the Hogencamp Deal property and the $10,000 mortgage on Hogencamp's property, and the leaving with the bank by Hogencamp of the Shaw notes and the attendant collateral which his payment of $35,000 just mentioned had taken out of the suspended debt account.

It will be observed in analyzing this transaction that so soon as the bank received Hogencamp's $35,000 note and passed the credit by bills discounted of $35,000 to the suspended debt account, Hogencamp became thereby vested with title to the Shaw notes and the attendant collateral, among which was the Denton mortgage in question. By then leaving those with the bank as additional collateral to his $35,000 note the situation just alluded to is not altered. At the instant of time when Hogencamp became vested with title to the Shaw notes and the Denton mortgage those notes and that mortgage were unenforceable in his hands. This, I do not think, can be seriously, if at all disputed. As respects Hogencamp, Shaw was an accommodation maker of the note in question—that is, the $12,000 note. Denton's mortgage, Hogencamp says, was collateral to this note. The only consideration which Hogencamp or anyone else can attribute to the Denton mortgage arises out of the Shaw note. The Shaw note, as against Shaw, and as a consideration for the Denton mortgage, can therefore only be good in the hands of an innocent third person who had advanced money thereon; when Hogencamp got back the title to the Shaw note for $12,000 and the attendant collateral, the Denton mortgage he could not, of

course, enforce any liability as against Shaw or any rights with respect to the mortgage that was collateral to the Shaw notes. If, when he so got them back, that was the fact, he could not, by leaving them with the bank, create any greater right in the bank than he had, because it will be observed that no new consideration moved from the bank on the note in question—that is, the Shaw note. By the transactions upon that date, March 24th, 1906, which were designed, as Hogencamp says, to put a live asset in the bank in place of the moribund Shaw asset, the bank loaned money to Hogencamp upon his $35,000 note secured by his mortgages on his Deal and Paterson properties; and the only consideration which passed from the bank to Hogencamp was the release to Hogencamp of these items out of the suspended debt account. There was no other possible reason for the transaction of March 24th, 1906, than to take out of the suspended debt account the $35,000 of balance which remained there.

If we were to attempt to follow the complainants in their argument made to review these apparent facts we are utterly unable to do so. The complainants attempt to waive aside all effect of this transaction of March 24th, 1906, and Hogencamp's testimony with respect to the antecedent facts, but do not, in my judgment, effectively do so; and do not, in the attempt to do so explain away the effect of the testimony and of each of the pieces of documentary proof.

The note of $35,000 which Hogencamp then gave to the bank admittedly was not used for any other purpose than to be discounted in favor of the suspended debt account That is, the bank at that time held Hogencamp on his $35,000 note, and, instead of giving him the proceeds (that is, the consideration which proceeded from the bank for its receipt of the note), passed those proceeds to the credit of the suspended debt account, for which account it had been holding Hogencamp responsible. The instant that they did this they carried out the purpose of the transaction, which was to hold Hogencamp and take out of the suspended debt account the moribund items which had theretofore been in it. The instant that these items were thus taken out they passed to Hogencamp, and the instant

they passed to Hogencamp they became invalid as against parties to this suit. That is, the note became invalid as against Shaw. It was an accommodation note; Hogencamp was the accommodation receiver of it, and certainly could not enforce it against the accommodation maker. With the note, as has been previously pointed out, of course, the right to recover on the collateral that had been deposited with it also ceased.

If this is not so, then, of course, the bank could not hold Hogencamp upon the $35,000; and it is inconceivable that they went through all of this transaction for no purpose; that they took his note, and, by the item of bill discounted, passed it to the credit of suspended debt account and took from him mortgages aggregating $45,000, all for no consideration—all, therefore, in its, the bank's, hands invalid.

It is quite obvious from all of the testimony that they did not do any such futile thing as this. They took from Hogencamp a valid security secured by collateral of a large amount for a valid purpose and consideration. That valid consideration was the taking out of the suspended debt account of the Shaw notes and other items for which the bank, with Hogencamp's assent, was holding Hogencamp liable.

When they did, by this transaction, thus take those items out of that account, and those notes (the Shaw notes and the Pratt & Wellman notes), passed to Hogencamp, they became, as has been heretofore pointed out, invalid in Hogencamp's hands so far as Shaw was concerned on his $12,000 note; and Denton's mortgage, which was collateral thereto, likewise became invalid to Hogencamp.

By what I have termed his "repledge" of these notes to the bank, the bank cannot, certainly in my view of the facts and of the law, acquire any right to hold Shaw or Denton—Shaw on his note, or Denton on his mortgage.

The only aspect of the case in which the bank could successfully assert any such right would be if they had advanced any new consideration at the time of reacquiring title to the note and its attendant collateral. They did not, as has just been pointed out, do any such thing. The consideration which they advanced was the giving up of this very note to Hogencamp in

consideration of which Hogencamp gave them his note for $35,-000 and the $45,000 of attendant collateral. The repledging with or the retaining by the bank of the Shaw notes was, therefore, ineffective as vesting them with any valid right as against Shaw on the note, or Denton on the collateral.

There is evidence in the case strongly confirmatory of the finding of facts just set forth, which unfortunately is somewhat complicated and requires a detailed explanation.

The note of $12,000 of Shaw which was originally loaned upon on the 24th day of July, 1902, was dated June 30th, 1902. Why it did not bear the same date as the $13,000 note nobody explains. That note was introduced in evidence in the case of *Richards* v. *Shaw*, and was inspected by me. It has since been mislaid or lost.

Upon the back of the $13,000 note, which it will be recalled, was loaned upon by the bank on the same date, there now appears in Hogencamp's handwriting an endorsement as follows: "Pay to William Hogencamp or order," under which Shaw had written his signature. Then, in Hogencamp's handwriting, "without recourse, William Hogencamp."

Hogencamp in this suit testifies that he placed this writing upon that note of $13,000 to relieve himself of the responsibility as an endorser. He testifies in this suit that he does not recollect whether he made the same endorsement on the $12,000 note. There is no conceivable reason why he should not have made the same endorsement upon both notes, since the whole transaction was one and undivided, and whatever he did with respect to one, he, undoubtedly, in my judgment, did with respect to the other. Since he, or the parties who claim through him, are chargeable with the custody, and, therefore, with the consequences of the loss of this note, it is proper to assume, as against them, that upon the back of the $12,000 note was the same endorsement by Hogencamp.

In the case of *Richards* v. *Shaw*, as is shown by the testimony in this present case, Hogencamp testified that he made the endorsement quoted above on that $13,000 note when he took the note up from the bank, which he then said was in 1905. It will,

therefore, be assumed that he did the same thing at the same time with respect to the $12,000 note.

He now testifies in this suit that he was mistaken when he testified in that suit that he had taken the notes up.

I find, as above set forth, that he was not mistaken; that he did take the notes up, if not in 1905, then in 1906; and I have no doubt, from the testimony to which what I have just alluded is additional confirmation, that at the time that he put these notes back in the bank—repledged them, as I have termed it—he wrote upon the back of each of them this endorsement.

There was no other occasion when he should have done any such thing. Up to the time that the notes were put into the suspended debt account they were always in the custody of the bank; Hogencamp had nothing whatever to do with them; was not legally held responsible with respect to them, and there would have been no occasion for him to have put any writing whatever upon them. After he made the arrangement with the bank which he first attempted to make with Harding by which the notes passed directly to him and became his property, he having paid to the bank the $35,000 to take them up, and it was understood that he was to repledge them with the bank, there was opportunity and occasion for him to make them payable to his order and to endorse them "without recourse." That he did this appears from the remaining note which has not been lost, by the inference which I think should necessarily be made in this case with respect to the note that has been lost, and here is strong evidence in favor of the finding that he did take these notes up and repledge them in 1906, as above set forth.

The result of this analysis of the case under this first theory advanced by the complainants, is that the bank, the complainants, cannot hold Shaw upon the note, and, therefore, cannot hold Denton upon the mortgage suit, if it be settled that there is nothing due upon the Shaw $12,000 note—that is, nothing due to the bank as a third person who initially cashed the note; or nothing due to Hogencamp, to whom the note was originally given by Shaw, and who reacquired it in the manner above set forth and repledged it as aforesaid.

And this brings us to the second contention of the complainants. That contention, broadly stated, is, first, that the stock transaction of the 23d of April, 1900, between Hogencamp and Denton, was a *bona fide* sale by the former to the latter for $24,-000, and that the full consideration has never been paid by Denton to Hogencamp, and Shaw's note was given to represent that indebtedness, and while Shaw was an accommodation maker of the note, he and Denton must each be held (Shaw on the note, and Denton on the mortgage collateral to the note) until the full amount of the said consideration has been paid, or satisfied, to Hogencamp; and second, that even if the transaction was not a *bona fide* sale, but was of such a nature that Hogencamp can hold Shaw and Denton for whatever benefit Denton got out of the use of the stock by borrowing upon it, Hogencamp or the bank may recover as against Shaw and Denton such amount—that is, the amount which it may be determined that Denton benefited by the use of Hogencamp's stock.

Dealing, first, with the stock transaction of the 23d of April, 1900, it is extremely difficult to follow to a conclusion, reviewing the various relevant proofs, either version without being confronted by contradictory circumstances which interfere with a clear determination—that is to say, neither Hogencamp's version nor Denton's version stands the test of comparison with the other facts in the case.

Hogencamp, it will be recalled, testifies positively that on the date in question there was a simple sale by him of the stock for $24,000, and that he handed the stock to Denton and had it handed back to him as collateral, and that Denton gave his notes therefor. In contradiction of this we find, first, that he never caused any stock to be transferred to Denton until August 12th, 1901, that he loaned to Denton fifty shares of this very stock on the 15th of August, 1901, to be used by Denton in arranging with one of Denton's creditors in New York. This is the McKelvey transaction: That at that time Hogencamp took from Denton a $7,500 mortgage to secure Hogencamp for having loaned Denton these fifty shares of stock. We further find that on the 16th day of November, 1901, Hogencamp writes to the people who had these fifty shares of stock that he, Hogencamp,

was the owner of it; that Denton never owned it, and that he had simply loaned the stock to Denton to enable Denton to borrow money upon it. We further find that Hogencamp always had the stock in his possession excepting when it was pledged for loans. He only identifies three dividend checks during all of the ensuing years which in any way went to Denton's benefit. The testimony shows that large dividends were declared twice a year upon the stock of the Second National Bank during all of the period from 1900 when this transaction is said to have taken place down to 1905, when we lose interest in it. Hogencamp does not attempt to trace any of these dividends to Denton, or to Denton's benefit, excepting that he produces three checks for eighteen months of dividends which were all deposited at one time in one of the three accounts heretofore adverted to, which Hogencamp was carrying in the bank, and in which he says he was depositing Denton's moneys. He does not pretend that Denton knew anything about these three checks, or about the receipt for his benefit of any moneys from dividends. Denton denies that he ever knew anything about any dividends, or received any dividends, or inquired for any dividends. He says that he gave a proxy to Hogencamp for the stock after the stock was transferred to him on the 12th of August, 1901, and thereafter never concerned himself with it.

Hogencamp also refers, in furtherance of his version, to the letter which he wrote and caused Shaw to sign on the 20th of August, 1901. That letter, it will be recalled, was addressed to Hogencamp, president, and requested him to deliver to Denton the one hundred shares of stock, and was signed, as just stated, by Shaw. At that very time fifty shares of the one hundred had already, without consulting Shaw in any way, been loaned by Hogencamp to Denton to take to McKelvey in New York, to be loaned upon for Denton's benefit, and partially for Hogencamp's benefit, in that he received over $3,000 of the proceeds of that loan.

In passing, it must be stated that he says that this money went to Denton's benefit in one of the three accounts containing Denton's moneys which Hogencamp says he was keeping in the bank.

When the stock was finally obtained from the Hudson Trust Company, where the last loan was made upon it, it went back to Hogencamp and he retained it in his possession down to the 7th of September, 1905, when he sold it, together with all of the other stock which he owned in the bank. A question has arisen, in my mind, which the recital of this fact revives, whether, as against Shaw, and also as respects Denton, the $19,000 which Hogencamp says he received from this stock at that time, must not be credited on this indebtedness—perhaps, I had better say "alleged indebtedness" of $24,000?

Passing this for the moment, however, we find that when he sold the stock on the date just given, he gave no notice of any sort to Denton, and did with the proceeds what he willed. What he chose to do, he says, was to credit Denton with $10,000, which he says he paid for Denton at the Hudson Trust Company at the time that the loan there, to which the one hundred shares was held as collateral, was paid off, and with some items of interest, and the balance he credited on an old note of Denton's for $13,000, which was dated July 19th, 1901. The balance credited on this note was $7,652.80.

It will thus be seen that it is very difficult to believe Hogencamp's version of this transaction, and to find that there was a *bona fide* sale of this stock to Denton.

There is no earthly reason suggested why Denton, who was at that time heavily engaged in real estate operations in New York, and who was so affiliated with Hogencamp that through Hogencamp he was then receiving and hopeful in the future of receiving large sums of money, should want to become a stockholder in the bank. Denton says that he had no such desire, and that it never occurred to him, and that he knew nothing about the stock or its value, and never purchased it, and only participated in the transaction at Hogencamp's suggestion.

I am inclined to think and to find that the truth lies between the two versions.

What I find from the facts in evidence is that upon the date in question, April 23d, 1900, Denton and Hogencamp made an arrangement of the following nature: They each wished to do whatever would enable them to obtain the largest amount of

loans from banking institutions. Hogencamp, as a stockholder in the bank, could not obtain loans from that bank upon its own stock. Other institutions probably would loan with this stock as collateral. Denton could not, upon his own mortgages, obtain loans upon his own notes. If Denton gave mortgages to Hogencamp, and also notes which Hogencamp would endorse, money could have been obtained upon those notes with the mortgages as collateral. If, in turn, Hogencamp put title to some of his stock in Denton, and took from him as apparent consideration notes, those notes would be used with the mortgages, as just stated, and Denton could take the stock and borrow at other institutions upon notes which he would give with the stock as collateral.

I do not, therefore, find that there was any sale from Hogencamp to Denton, and this, I think, squares itself with all the facts.

I do find, however, that the transaction was about as above outlined, and that to the extent that Denton benefited by loans obtained upon Hogencamp's stock, he must make good to Hogencamp such amounts—that is to say, if he borrowed upon Hogencamp's stock, and Hogencamp subsequently paid off the amounts thus borrowed, Denton, to the extent that he got the benefit of the original loans, must repay Hogencamp.

Whether Denton owes money to Hogencamp on the stock must depend upon the broad question of whether Denton owes Hogencamp any money. As has heretofore been pointed out, the dealings between these parties involves thousands upon thousands of dollars and concerns innumerable items; and if, as a result of an accounting, it should appear that Hogencamp has had more money from Denton than equals all that Denton owes him, or as much money as equals what he advanced to Denton, he cannot hold Denton for anything more. Since this stock transaction was only one of a great number of these transactions between the parties, it cannot be segregated and dealt with as if it were a separate severable item; and whether or not Denton has paid Hogencamp for the stock, or for the use of the stock, as above suggested, can only be determined after an accounting has taken place which shows as a result of it whether Denton owes any

money to Hogencamp as the result of their dealings with each other.

To the extent that Denton may owe money to Hogencamp in all of their dealings, I am inclined to think that, under the facts in this case, Hogencamp would be justified in holding this Shaw note and the mortgage which is collateral to it for such amount.

Since there is nothing to show that Denton ever specifically repaid to Hogencamp the sums of money which Hogencamp proves that he paid on Denton's account to get back the stock from those from whom Denton had borrowed money with the stock as collateral, it is impossible to separate this item from the others; and if, as a result of an accounting between Denton and Hogencamp, it be shown that Denton still owes Hogencamp money, Hogencamp, or the bank as the repledgee of the note with the mortgage as collateral, can attribute the payments to other things and still hold this debt open and enforceable.

Any attempt to follow Denton's version that the entire transaction concerning the stock was for Hogencamp's benefit, we are immediately met by circumstances entirely inconsistent with this explanation. A large part, if not all, of the money borrowed at various times and places upon the stock went to Denton's benefit. From his own bank account, or from accounts in which he was interested, he made payments upon loans where the stock was held as collateral, both on principal and interest. It is very difficult to escape from the conclusion which the court things is the true one, that both the stock and the mortgages were conceived and used for the mutual benefit of Denton and Hogencamp.

My final conclusion, therefore, is that there must be an accounting between Denton and Hogencamp, and that the final decree must abide the result of that accounting.